# No. 16-4551

# In The
# United States Court of Appeals
# For The Eighth Circuit

MUHAMMAD ABDURRAHMAN,

*Appellant,*

v.

MARK DAYTON, IN HIS OFFICIAL CAPACITY AS
GOVERNOR OF THE STATE OF MINNESOTA,
LORI SWANSON, IN HER OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF MINNESOTA,
AND STEVE SIMON, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE FOR THE STATE OF MINNESOTA,

*Appellees.*

---

Appeal from the United States Court District Court
for the District of Minnesota

---

**BRIEF FOR APPELLANT**

---

Daniel J. Cragg
Vince C. Reuter
Jared M. Reams
ECKLAND & BLANDO P.A.
800 Lumber Exchange Building
10 South Fifth Street
Minneapolis, MN 55402
(612) 236-0160

March 9, 2017                    *Counsel for Appellant*

2017 – BACHMAN LEGAL PRINTING – FAX (612) 337-8053 – PHONE (612) 339-9518 or 1-800-715-3582

Appellate Case: 16-4551     Page: 1     Date Filed: 03/09/2017 Entry ID: 4510728

## SUMMARY OF THE CASE

Appellant, a duly-appointed Presidential Elector for the State of Minnesota, cast his ballots for Bernie Sanders for President and Tulsi Gabbard for Vice-President, even though Hillary Clinton and Tim Kaine were his party's nominees. Consistent with the Uniform Faithful Presidential Electors Act ("UFPEA"), Appellees refused to count the ballots after Appellant cast them, unilaterally declared that he had vacated his position as an Elector, and counted an alternative Elector's ballots instead. Appellant immediately filed suit seeking, in part, a declaration that UFPEA is repugnant to the U.S. Constitution and of no force and effect.

Four days after Appellant filed suit, after only a hearing for preliminary injunction, the district court erroneously dismissed his entire complaint as moot. The court based its decision on *sua sponte* finding that Appellant would never be subject to UFPEA again, and thus his case was not capable of repetition, yet evading review. But if given the opportunity, Appellant can demonstrate a probability that he will be subject to UFPEA again, whether in 2020 or beyond, and thus his case is not moot.

Oral argument should be heard because it will assist this Court in correcting the district court's erroneous decision to dismiss Appellant's case. Because this argument may include the pending motion to supplement the record, Appellant requests 20 minutes of oral argument time per side.

i

# TABLE OF CONTENTS

*Page(s)*

SUMMARY OF THE CASE.................................................................i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ..........................................................iv

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES.........................................................2

STATEMENT OF THE CASE...........................................................3

    I.    Factual History ...........................................................3

    II.    Procedural History........................................................10

SUMMARY OF THE ARGUMENT .....................................................13

ARGUMENT ...........................................................................15

    I.    THE DISTRICT COURT HAD JURISDICTION BECAUSE
        APPELLANT'S DECLARATORY RELIEF CLAIM IS
        CAPABLE OF REPETITION, YET EVADING REVIEW..............16

        A.    The Standard of Review for this Court is *De Novo*....................16

        B.    Appellant's Declaratory Relief Claim Falls Squarely in
            the Capable of Repetition, Yet Evading Review
            Exception to Mootness. ................................................17

            1.    The capable of repetition standard is low in cases
                challenging election laws....................................19

            2.    Appellant has demonstrated a probability that his
                declaratory relief claim is capable of repetition. .................29

Appellate Case: 16-4551    Page: 3    Date Filed: 03/09/2017 Entry ID: 4510728

3.  The district court's reasoning would make UFPEA
    unreviewable by an appellate court ....................................34

II.  THE DISTRICT COURT PREMATURELY DISMISSED
     APPELLANT'S DECLARATORY RELIEF CLAIM. .....................37

     A.  The Standard of Review for this Court is *De Novo* ....................37

     B.  The District Court Dismissed Appellant's Declaratory
         Relief Claim Based on an Unsubstantiated *Sua Sponte*
         Finding of Fact ...............................................................................38

     C.  The District Court Deprived Appellant of Notice and a
         Reasonable Opportunity to be Heard. .........................................39

CONCLUSION ...............................................................................................44

CERTIFICATE OF COMPLIANCE ..............................................................46

CERTIFICATE OF SERVICE .......................................................................47

ADDENDUM ................................................................................................48

Appellate Case: 16-4551     Page: 4     Date Filed: 03/09/2017 Entry ID: 4510728

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Anderson National Bank v. Luckett*,
  321 U.S. 233 (1944)................................................................40
*Anderson v. Celebrezze,*
  460 U.S. 780 (1983)................................................................20
*Arcia v. Florida Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) ..........................................22
*Arkansas AFL-CIO*,
  11 F.3d 1430 (8th Cir. 1993) ...............................................20
*Barilla v. Ervin*,
  886 F.2d 1514 (9th Cir. 1989) ......................................19, 24
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................43
*Bryson v. Brand Insulations, Inc.*,
  621 F.2d 556 (3d Cir. 1980) .................................................43
*California Diversified Promotions v. Musick*,
  505 F.2d 278 (9th Cir. 1974) .......................................3, 4, 40
*Catholic Leadership Coalition of Texas v. Reisman*,
  764 F.3d 409 (5th Cir. 2014) .........................................21, 23
*Charleston Hous. Auth. v. U.S. Dep't of Agric.*,
  419 F.3d 729 (8th Cir. 2005) ...............................................17
*Citizens & Landowners Against the Miles City/New Underwood
  Powerline v. Sec'y, U.S. Dep't of Energy*,
  683 F.2d 1171 (8th Cir. 1982) .............................................32
*Corrigan v. City of Newaygo*,
  55 F.3d 1211 (6th Cir. 1995) ...............................................37
*Davis v. Federal Election Com'n*,
  554 U.S. 724 (2008)..........................................................20, 28
*Dodd v. Spokane County*,
  393 F.2d 330 (9th Cir. 1968) .........................................40, 42
*Drevlow v. Lutheran Church, Missouri Synod*,
  991 F.2d 468 (8th Cir. 1993) ...............................................42
*Dunn v. Blumstein*,
  405 U.S. 330 (1972)....................................................20, 22, 23
*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*,
  551 U.S. 449 (2007)..........................................................passim

Appellate Case: 16-4551     Page: 5     Date Filed: 03/09/2017 Entry ID: 4510728

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
 528 U.S. 167 ..................................................................................36

*Gutensohn v. Kansas City S. Ry. Co.*,
 140 F.2d 950 (8th Cir. 1944) ......................................................3, 40

*Hall v. Beals*,
 396 U.S. 45 (1969)....................................................................24, 36

*Holmes v. F.E.C.*,
 823 F.3d 69 (D.C. Cir. 2016) ...........................................................21

*Honig v. Doe*,
 484 U.S. 305 (1988)...................................................................passim

*Keating v. Nebraska Pub. Power Dist.*,
 562 F.3d 923 (8th Cir. 2009) ............................................................38

*Kucinich v. Texas Democratic Party*,
 563 F.3d 161 (5th Cir. 2009) ............................................................22

*LaRouche v. Fowler*,
 152 F.3d 974 (D.C. Cir. 1998) ..........................................................21

*Lawrence v. Blackwell*,
 430 F.3d 368 (6th Cir. 2005) ............................................................22

*Lewis v. Cont'l Bank Corp.*,
 494 U.S. 472 (1990)...................................................................18, 39

*Lewis v. New York*,
 547 F.2d 4 (2d Cir. 1976)..................................................................42

*Libertarian Party of Michigan v. Johnson*,
 714 F.3d 929 (6th Cir. 2013).............................................................22

*Libertarian Party of New Hampshire v. Gardner*,
 843 F.3d 20 (1st Cir. 2016)...............................................................21

*Libertarian Party of Ohio v. Husted*,
 831 F.3d 382 (6th Cir. 2016) ......................................................19, 21

*Literature, Inc. v. Quinn*,
 482 F.2d 372 (1st Cir. 1973)........................................................3, 40

*Majors v. Abell*,
 317 F.3d 719 (7th Cir. 2003) ..................................................21, 22, 24

*Mandel v. Bradley*,
 432 U.S. 173 (1977)........................................................................20

*Merle v. United States*,
 351 F.3d 92 (3d Cir. 2003) ........................................................21, 29

*Missourians for Fiscal Accountability v. Klahr*,
 830 F.3d 789 (8th Cir. 2016) ......................................................passim

*Moore v. Ogilvie*,
 394 U.S. 814 (1969)...............................................................20, 27, 28

Appellate Case: 16-4551 Page: 6 Date Filed: 03/09/2017 Entry ID: 4510728

*Murphy v. Hunt*,
  455 U.S. 478 (1982) ....................................................................18, 19

*N. Carolina Right To Life Comm. Fund For Indep.*
  *Political Expenditures v. Leake*,
  524 F.3d 427 (4th Cir. 2008) ...............................................29

*Nat'l Org. for Marriage, Inc. v. Walsh*,
  714 F.3d 682 (2d Cir. 2013) ...............................................21

*Nat'l Right to Life Political Action Comm. v. Connor*,
  323 F.3d 684 (8th Cir. 2003) ...............................2, 20, 34

*Norman v. Reed*,
  502 U.S. 279 (1992)........................................................20

*North Carolina v. Rice*,
  404 U.S. 244 (1971)........................................................39

*Parker v. Winter*,
  645 F. App'x 632 (10th Cir. 2016).....................19, 20, 21

*Perez v. Ortiz*,
  849 F.2d 793 (2d Cir. 1988) ..............................................41

*Ricketts v. Midwest Nat. Bank*,
  874 F.2d 1177 (7th Cir. 1989) .....................................41, 44

*Roe v. Wade*,
  410 U.S. 113 (1973)........................................................36

*Rosario v. Rockefeller*,
  410 U.S. 752 (1973)..............................................20, 23, 25

*Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*,
  40 F.3d 247 (7th Cir. 1994) ..............................................43

*Schaefer v. Townsend*,
  215 F.3d 1031 (9th Cir. 2000) .....................................21, 29

*Schlesinger Inv. P'ship v. Fluor Corp.*,
  671 F.2d 739 (2d Cir. 1982) ..............................................41

*Southern Pacific Terminal Co. v. ICC*,
  219 U.S. 498 (1911)........................................................18

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
  760 F.2d 1347 (2d Cir. 1985) ...........................................40

*Stop Reckless Economic Instability Caused by Democrats v.*
  *Federal Election Com'n*,
  814 F.3d 221 (4th Cir. 2016) ..............................19, 21, 23

*Storer v. Brown*,
  415 U.S. 724 (1974)..............................................20, 23, 33

*Super Tire Eng'g Co. v. McCorkle*,
  416 U.S. 115 (1974)........................................................39

vi

Appellate Case: 16-4551    Page: 7    Date Filed: 03/09/2017 Entry ID: 4510728

*Teper v. Miller*,
  82 F.3d 989 (11th Cir. 1996) ...............................................................21

*Thournir v. Buchanan*,
  710 F.2d 1461 (10th Cir. 1983) ...........................................................41

*Tingler v. Marshall*,
  716 F.2d 1109 (6th Cir. 1983) .......................................................3, 44

*U.S. Parole Comm'n v. Geraghty*,
  445 U.S. 388 (1980).............................................................................36

*United States v. Gould*,
  536 F.2d 216 (8th Cir. 1976) .......................................................passim

*Van Bergen v. State of Minn.*,
  59 F.3d 1541 (8th Cir. 1995) ...............................................20, 25, 37

*Van Wie v. Pataki*,
  267 F.3d 109 (2d Cir. 2001) ................................................................23

## STATUTES

3 U.S.C. § 7 .........................................................................................35
3 U.S.C. § 9 .........................................................................................12
3 U.S.C. § 10 .......................................................................................12
3 U.S.C. § 11 .......................................................................................12
3 U.S.C. § 15 .................................................................................12, 13
28 U.S.C. § 1291 ...................................................................................1
28 U.S.C. § 1331 ...................................................................................1
42 U.S.C. § 1983 .............................................................................1, 11
Minn. Stat. § 208.43 ...............................................................................4
Minn. Stat. § 208.45 ...............................................................................9
Minn. Stat. § 208.46 ...............................................................................9

## RULES

Fed. R. Civ. P. 8 ..................................................................................29
Fed. R. Civ. P. 12 ................................................................................42
Fed. R. Civ. P. 32 ................................................................................47

## OTHER AUTHORITIES

*The Partially Prudential Doctrine of Mootness*,
  77 Geo. Wash. L. Rev. 562 (2009) .....................................................20

Appellate Case: 16-4551    Page: 8    Date Filed: 03/09/2017 Entry ID: 4510728

## JURISDICTIONAL STATEMENT

Mr. Abdurrahman commenced this civil action in the United States District Court for the District of Minnesota pursuant to Section 1 of the Civil Rights Act of 1871, Rev. Stat. 1979, codified at 42 U.S.C. § 1983 to protect his constitutional right as a duly appointed Elector of President and Vice President of the United States, pursuant to Article II and Amendment XII of the U.S. Constitution. The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331.

The United States District Court for the District of Minnesota issued its order denying Appellant's motion for preliminary injunction and for dismissal of the action as moot on December 23, 2016, and the clerk entered judgment on December 27, 2016. Appellant timely filed his Notice of Appeal on December 27, 2016. This Court has jurisdiction over the order and judgment appealed from pursuant to 28 U.S.C. § 1291.

1

# STATEMENT OF THE ISSUES

1.     *Whether Appellant's Declaratory Relief Claim is "Capable of Repetition, Yet Evading Review."* Appellant has demonstrated that he intends to run for Presidential Elector again for the DFL in Congressional District 5 and that he will likely win. The capable of repetition standard in an election case is whether a former candidate demonstrates a probability that he will be subject to the challenged law again, even if it is more probable he will not be subject to the law again. Did Appellant meet the capable of repetition standard?

The most apposite cases for this issue are:

(1) *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449 (2007);
(2) *Honig v. Doe*, 484 U.S. 305 (1988);
(3) *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789 (8th Cir. 2016); and
(4) *Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684 (8th Cir. 2003).

2.     *Whether the District Court Prematurely Dismissed Appellant's Declaratory Relief Claim.* Due process demands that a district court provide a party notice and a reasonable opportunity to be heard before dismissing a claim. The district court dismissed Appellant's declaratory relief claim as moot just four days after the filing of his complaint, based on an unsubstantiated and *sua sponte* finding of fact, on a motion for preliminary injunction, and without any briefing or argument on the issue of mootness. Was the district court's dismissal premature and in violation of Appellant's due process rights?

The most apposite cases for this issue are:

(1) *Gutensohn v. Kansas City S. Ry. Co.*, 140 F.2d 950 (8th Cir. 1944);
(2) *Literature, Inc. v. Quinn,* 482 F.2d 372, 374 (1st Cir. 1973);
(3) *Tingler v. Marshall*, 716 F.2d 1109 (6th Cir. 1983); and
(4) *California Diversified Promotions v. Musick*, 505 F.2d 278 (9th Cir. 1974).

Appellate Case: 16-4551     Page: 10     Date Filed: 03/09/2017 Entry ID: 4510728

## STATEMENT OF THE CASE

### I.  Factual History

### *Nomination and Election of*
### *Dr. Abdurrahman as a Presidential Elector*

On or about May 7, 2016, Caroline Hooper nominated Appellant Dr.
Muhammad Abdurrahman as a candidate for Presidential Elector in Minnesota
Congressional District 5 ("CD5") for the Minnesota Democratic-Farmer-Labor
Party[1] ("DFL").[2] (Appx038.)[3] Ms. Hooper nominated Dr. Abdurrahman because she
believed he possessed the requisite wisdom, integrity, and character for that
important position. (*Id.*) When nominated, Dr. Abdurrahman was a known supporter
of Bernie Sanders as the Democratic Party's nominee for President of the United

---

[1]   The DFL is Minnesota's affiliation with the larger Democratic Party of the
United States. *See Overview & DFL History*, MINNESOTA DEMOCRATIC-FAMER-
LABOR PARTY, www.dfl.org/about-our-party/overview-dfl-history (last visited
February 21, 2017).

[2]   Dr. Abdurrahman submitted his own declaration and Ms. Hooper's
declaration as exhibits to his motion to supplement the record. Pursuant to this
Court's February 13, 2017 Order, Dr. Abdurrahman's motion has been taken with
the case for consideration by this Panel. Thus, because this Court will not rule on his
motion before the briefing deadline, Dr. Abdurrahman includes these declarations in
his Appendix knowing that they are not yet officially part of the record. But Dr.
Abdurrahman also notes that an inability to cite to a factual record on the issue of
capable of repetition, yet evading review confirms the district court's dismissal of
his declaratory relief claim was premature.

[3]   Citations to "Appx_" refer to Appellant's Separate Appendix.

Appellate Case: 16-4551    Page: 11    Date Filed: 03/09/2017 Entry ID: 4510728

States, as opposed to Hillary Clinton. (Appx034.) As a nominee for Presidential Elector, Minnesota law required Dr. Abdurrahman to make the following pledge:

> If selected for the position of elector, I agree to serve and to mark my ballots for president and vice president for the nominees for those offices of the party that nominated me.

*See* Minn. Stat. § 208.43. Dr. Abdurrahman recited that pledge. (Appx024.) After his nomination, with full knowledge of his support for Bernie Sanders, a majority the DFL delegates in CD5 elected Dr. Abdurrahman to be a Presidential Elector. (Appx034.) The DFL certified its nomination of Dr. Abdurrahman as an Elector on August 11, 2016, which Appellees received on August 15, 2016. (Appx041.)

### *Nomination of Hillary Clinton and Email Hacking Controversy*

This case necessarily invokes the unique facts underlying the 2016 presidential primary and general elections.[4] In the primary, most DFL delegates in CD5 joined Dr. Abdurrahman in support of Bernie Sanders as the Democratic Party's nominee for President.[5] Indeed, within CD5, almost two-thirds of delegates

---

[4]     In this brief, Dr. Abdurrahman cites media reports of events that occurred during the 2016 presidential election. *See infra* notes 5-11, 13. This Court has the inherent power to recognize the facts within these media reports because they are indisputable legislative facts. *See United States v. Gould*, 536 F.2d 216, 220 (8th Cir. 1976) ("Legislative facts are established truths, facts or pronouncements that do not change from case to case but apply universally, while adjudicative facts are those developed in a particular case.")

[5]     At the March 3, 2016 DFL Presidential Caucus, Bernie Sanders defeated Hillary Clinton in CD5 with 64.88% of the votes over 35.12%. Across Minnesota,

4

supported Bernie Sanders over Hillary Clinton.[6] (Appx034.) Nevertheless, across the United States, Hillary Clinton defeated Bernie Sanders and became the Democratic Party's nominee for President of the United States. (Appx042.)

Hillary Clinton's nomination over Bernie Sanders came with considerable controversy within the Democratic Party.[7] A hacking and public release of Democratic National Committee ("DNC") emails produced evidence suggesting that "the committee was actively trying to undermine Bernie Sanders's presidential campaign."[8] As a fallout from this controversy, the chair of the DNC resigned.[9] After

---

Bernie Sanders defeated Hillary Clinton with 61.64% of the votes over 38.36%. *See Minnesota Caucus Results,* St. Paul Pioneer Press, http://www.twincities.com/2016/03/01/minnesota-caucus-2016-results (last visited February 21, 2017).

[6]      *See id.*

[7]      *See* Jonathan Martin and Alan Rappeport, *Debbie Wasserman Schultz to Resign D.N.C. Post*, New York Times, https://www.nytimes.com/2016/07/25/us/politics/debbie-wasserman-schultz-dnc-wikileaks-emails.html (last visited February 21, 2017) ("Democrats arrived at their nominating convention on Sunday under a cloud of discord[.]);

[8]      *See* Aaron Blake, *Here are the latest, most damaging things in the DNC's leaked emails*, The Washington Post, https://www.washingtonpost.com/news/the-fix/wp/2016/07/24/here-are-the-latest-most-damaging-things-in-the-dncs-leaked-emails/?utm_term=.46aefeb35492 (last visited February 21, 2017); *accord* Michael D. Shear and Matthew Rosenberg, *Released Emails Suggest the D.N.C. Derided the Sanders Campaign*, The New York Times, https://www.nytimes.com/2016/07/23/us/politics/dnc-emails-sanders-clinton.html?_r=0 (last visited February 21, 2017).

[9]      *See* Martin & Rappeport, *supra* note 7.

seeing these emails, some Bernie Sanders supporters believed that the DNC conspired to ensure that Hillary Clinton received the nomination.[10] Other Bernie Sanders supporters also publicly refused to vote for Hillary Clinton in the general election, despite her being the Democratic candidate.[11]

### *Appointment of Dr. Abdurrahman as a Presidential Elector and Subsequent Casting of Ballots*

On the November 8, 2016, Hillary Clinton and Tim Kaine received the most votes for President and Vice-President, respectively, in the State of Minnesota. (*Id.*) Because Ms. Clinton and Mr. Kaine were the DFL candidates, as a matter of law, the State of Minnesota appointed Dr. Abdurrahman as an Elector. (*Id.*) In turn, on December 13, 2016, consistent with federal law, Appellees Governor Dayton and Secretary Simon delivered Certificates of Ascertainment to the National Archives, which listed Dr. Abdurrahman as a duly-appointed Presidential Elector in the State of Minnesota. (*Id.*)

---

[10]   *See id.* ("'Thank God for WikiLeaks,' said Dan O'Neal, a delegate from Arizona who was wearing a 'Bernie for President' T-Shirt. 'The party was stacked from the beginning with Debbie in charge.'")

[11]   *See id.* ("But many of Mr. Sanders's supporters were not ready to let go, and their frustration could be seen on the streets here. A large boisterous crowd of his supporters, chanting 'hell, no, D.N.C., we won't vote for Hillary,' marched toward the site of the Democratic National Convention on Sunday afternoon.")

As a duly-appointed Elector, Dr. Abdurrahman attended Minnesota's meeting of Electors on December 19, 2016 to cast his ballots for President and Vice-President. (Appx034, Appx043.) This meeting began with ceremonial formalities, including Dr. Abdurrahman reciting an oath to uphold the Minnesota and United States Constitutions. (*See* Appx043.) Soon after, Bert Black, a legal advisor to Secretary Simon, handed Dr. Abdurrahman one ballot for President and one ballot for Vice-President, and Secretary Simon instructed him to write down his votes. (Appx043-44.) Before voting, Dr. Abdurrahman reflected on many considerations, including the events that lead to Hillary Clinton becoming the DFL party's nominee after he was elected as a Presidential Elector. (Appx034.) After this personal reflection and deliberation, Dr. Abdurrahman, as a matter of conscience, cast his ballots for Bernie Sanders for President and Tulsi Gabbard for Vice-President. (*Id.*)

### Appellees Refuse to Accept
### Dr. Abdurrahman's Ballots After Inspection

After all ballots were cast, Secretary Simon, acting in his official capacity as Minnesota's Secretary of State, asked the Electors to approach him at the podium with their ballots to "present them for inspection[.]" (Appx044.) Dr. Abdurrahman, the fifth elector called to the podium, handed Secretary Simon his ballots, which were marked Bernie Sanders for President and Tulsi Gabbard for Vice-President. (Appx034, Appx044.) Secretary Simon "did not accept" Dr. Abdurrahman's ballots. (*Id.*) Instead, Secretary Simon "announced that, because Abdurrahman had not

7

complied" with Minnesota law, *i.e.*, UFPEA, "he had vacated" his position as a Presidential Elector for the State of Minnesota. (*Id.*) Secretary Simon then asked Dr. Abdurrahman to sit down, and "designated an alternate elector, Jill Garcia, to fill" the so-called "vacancy." (*Id.*) Ms. Garcia subsequently cast her ballots for Hillary Clinton for President and Tim Kaine for Vice-President, the only votes that Appellees would accept under color of Minnesota law. (*See id.*) In turn, Appellees delivered a Certificate of Vote reflecting Ms. Garcia's votes to be counted by Congress instead of Dr. Abdurrahman's votes.[12] (Appx044-45.)

Dr. Abdurrahman never intended to vacate his position as a duly-appointed Presidential Elector in the State of Minnesota. (Appx035.) Appellees' decision to deem Dr. Abdurrahman's position as having been vacated after he had already cast his ballots, under color of state law or otherwise, was Appellees' unilateral decision and was made without Dr. Abdurrahman's consent. (*Id.*)

### Reaction from DFL after Dr. Abdurrahman Voted for Bernie Sanders

Dr. Abdurrahman's cast his ballots for Bernie Sanders and Tulsi Gabbard over Hillary Clinton and Tim Kaine in public. (Appx044.) Dr. Abdurrahman's name, his

---

[12] The sections of UPFEA that mandated Appellees' actions described in this paragraph are found at Minn. Stat. §§ 208.45 and 208.46. And to be clear, Dr. Abdurrahman does not dispute that Appellees' complied with those sections when they refused to "accept" votes he already cast. He instead challenges those sections as unconstitutional under Article II and Amendment XII of the U.S. Constitution.

8

decision, the fact that he violated a state law, and the branding of him as a "faithless elector" – with its negative connotation – were also reported in the media.[13] Despite this, the response from members in the DFL has been universally positive. (Appx035.) Several DFL members have commended him for his decision to vote for Bernie Sanders out of conscience. (*Id.*) And nobody has yet responded negatively. (*Id.*) These positive responses have also come from leaders within the DFL. (*Id.*)

Ms. Hooper attended Minnesota's meeting of Electors on December 19, 2016, and witnessed Secretary Simon's refusal to accept Dr. Abdurrahman's ballots. (Appx038.) She learned soon after that he had voted for Bernie Sanders, instead of Hillary Clinton, out of conscience. (*Id.*) Upon learning this information, Ms. Hooper was proud of Dr. Abdurrahman's decision, and remains proud to this day. (*Id.*) She believes that, in voting for Bernie Sanders, he exhibited the wisdom, integrity, and character that she expected of him when she nominated him to be a Presidential Elector. (Appx038-39.)

### Dr. Abdurrahman Intends to Become a Presidential Elector Again in 2020 or Beyond

Dr. Abdurrahman intends to remain active in the DFL within CD5 through the 2020 elections and beyond. (Appx035.) This includes becoming a candidate for

---

[13]    *See* Brian Bakst, *'Faithless elector' dismissed, Minnesota's 10 votes go to Clinton,* MINNESOTA PUBLIC RADIO NEWS http://www.mprnews.org/story/2016/12/19/minnesota-electors-cast-10-votes-for-clinton (last visited February 21, 2017).

9

Presidential Elector again in 2020. (*Id.*) Likewise, Ms. Hooper intends to remain active in the DFL party through the 2020 presidential election and beyond. (Appx039.) In turn, if she has the opportunity, she will again nominate Dr. Abdurrahman as a Presidential Elector for the DFL in CD5. (*Id.*) Ms. Hooper intends to make this nomination because of Dr. Abdurrahman's decision to vote his conscience on December 19, 2016. (*Id.*)

Ms. Hooper also intends to vote for Dr. Abdurrahman as a Presidential Elector for CD5 in 2020. (*Id.*) It is also her opinion, based on experience and personal knowledge as a former DFL delegate in CD5, that a majority of delegates will again vote for Dr. Abdurrahman as Presidential Elector. (*Id.*) She believes this because Dr. Abdurrahman's decision to vote his conscience for Bernie Sanders in 2016 will find support within CD5. (*Id.*) Dr. Abdurrahman similarly believes that his decision to vote for Bernie Sanders in 2016 will have a positive impact on his ability to be reelected in 2020 as a Presidential Elector for CD5. (Appx035.)

## II. Procedural History

Dr. Abdurrahman filed his Verified Complaint for Injunctive and Declaratory Relief on December 19, 2016, within hours after Appellees refused to acknowledge his ballots, or deliver them to Congress, after they had already been cast. (*See* Appx015, Appx031.) Specifically, Dr. Abdurrahman sought an injunction under 42 U.S.C. § 1983 enjoining Appellees to (1) "accept, count, certify, and transmit to

10

Congress his Elector ballots," from (2) "deeming [Appellant's] position to have been vacated," and (3) from "accepting, counting, certifying as valid, or transmitting to Congress the votes of Jill Garcia." (Appx027-28.) Additionally, Dr. Abdurrahman sought declaratory relief that UFPEA is repugnant to the United States Constitution and is of no force and effect. (Appx028-30.)

Also on December 19, 2016, Dr. Abdurrahman filed a motion for a temporary restraining order ("TRO") and preliminary injunction. (*See* Appx015.) In this motion, Dr. Abdurrahman sought to restrain and enjoin Appellees from certifying and submitting ballots from the State of Minnesota under 3 U.S.C. §§ 9-11 without including Dr. Abdurrahman's votes. (Add002; Appx003, Appx030-31.)[14] The motion for TRO and preliminary injunction was time sensitive because Congress was scheduled to meet in joint session to count ballots for President and Vice-President of the United States on January 6, 2017. *See* 3 U.S.C. § 15.

The district court heard Dr. Abdurrahman's TRO motion on December 22, 2016 and denied it the following day. (*See* Add001; Appx002.) In addition to denying Dr. Abdurrahman's motion, however, the district court dismissed Dr. Abdurrahman's entire complaint on the basis that his declaratory relief was moot because it was not capable of repetition, yet evading review. (*See* Add001, Add003-04, Add011; Appx002, Appx004-05, Appx012.)

---

[14]     Citations to "Add_" refer to Appellant's Addendum.

Appellate Case: 16-4551     Page: 19     Date Filed: 03/09/2017 Entry ID: 4510728

The clerk of court entered final judgment on December 27, 2016. (Appx001.) In turn, Dr. Abdurrahman filed his notice of appeal in the district court the same day, and filed a motion for injunction pending appeal the following morning with this Court. (Appx016-17.) Dr. Abdurrahman also filed an application for injunction directed to Justice Alito as this Court's Circuit Justice with the Supreme Court. This Court denied the motion for injunction on January 4, 2017 without opinion, and Justice Alito denied the application for injunction on January 5, 2017, also without opinion.

On January 6, 2017, a joint session of Congress counted the votes of Presidential Electors submitted by the State of Minnesota. *See* 3 U.S.C. § 15. Because the district court, this Court, and Justice Alito declined to grant Appellant's motions and application for injunctive relief, Congress counted Jill Garcia's votes instead of Dr. Abdurrahman's votes. Thus, Dr. Abdurrahman's claim for injunctive relief in his complaint became moot, leaving only his claim for declaratory relief, which is presently on appeal.

Appellate Case: 16-4551    Page: 20    Date Filed: 03/09/2017 Entry ID: 4510728

# SUMMARY OF THE ARGUMENT

An exception to mootness that preserves subject matter jurisdiction exists when a claim is capable of repetition, yet evading review. A claim is capable of repetition when there is a reasonable expectation that the same complaining party will be subject to the same action again. Courts relax this standard in election cases. In fact, some jurisdictions do not even maintain the same-party requirement, and instead find jurisdiction if another similar party will likely be in the same position next election. Parties meet the low election-case standard when they demonstrate a probability that the same controversy will recur involving the same complaining party, and/or another like party, depending on the jurisdiction, even if it is ultimately more probable it will not recur.

Just four days after Dr. Abdurrahman filed his complaint, after only a TRO hearing, the district court dismissed Dr. Abdurrahman's entire complaint as moot. The court found that Dr. Abdurrahman's declaratory relief claim was not capable of repetition based on an unsubstantiated *sua sponte* finding that he will not be reelected as a Presidential Elector in the DFL again, and more generally because he cannot show that he will repeat the same unique conduct that brought this lawsuit. On appeal, Dr. Abdurrahman has moved to supplement the record with declarations showing (1) his intent to run for Elector again, and (2) the intent of another DFL member in CD5 to support him. This motion remains pending.

13

This Court has two alternative bases to address the district court's erroneous dismissal. First, it can reverse the district court because Dr. Abdurrahman has demonstrated a probability that he will be reappointed as Presidential Elector in Minnesota again, and thus be subject to UFPEA. He has shown that he intends to run again in CD5, has proven he can win, has shown his decision to vote for Bernie Sanders in 2016 was well received, and he can run his next campaign as a defender of Bernie Sanders, an individual who most DFL delegates in CD5 supported. This meets the low and assuming standard for election cases, and particularly when the likelihood of repetition in Dr. Abdurrahman's case *is* more probable than not.

Second, alternatively, because the district court dismissed Dr. Abdurrahman's declaratory relief claim in just four days, before any argument on the issue of mootness apart from his injunctive relief claim, this Court can remand the case for submissions and argument on the issue of mootness. Minimal due process requires notice of a court's potential action and a reasonable opportunity to be heard. The district court failed to meet this standard by dismissing Dr. Abdurrahman's claim based on its unsubstantiated *sua sponte* finding of fact before he had an opportunity to rebut this finding or present any evidence in support of jurisdiction.

14

# ARGUMENT

This appeal turns on whether Dr. Abdurrahman is capable of being subject to the Uniform Faithful Presidential Electors Act ("UFPEA") again. It is a factual inquiry. If Dr. Abdurrahman is incapable of being appointed as a Presidential Elector in Minnesota again, and thus subject to UFPEA, his case is moot. But if he *is* capable of being reappointed – *some* probability exists – his case is not moot. To a degree, the question is inherently speculative. Nobody can predict the future with precision. But that is not the standard for being capable of repetition. Dr. Abdurrahman must merely demonstrate facts suggesting a probability that he and/or other Electors will be subject to UFPEA again, whether in 2020 or beyond, and the likelihood of that event does not even have to be more probable than not.

But the district court did not adduce any facts. Instead, four days after Dr. Abdurrahman filed his complaint, before any discovery on this or any issue, it concluded that it was "especially unlikely" that Dr. Abdurrahman would again "be nominated as an elector by the DFL." (Add004; Appx005.) The court further concluded that the exact same sequence of events that led to Dr. Abdurrahman's present lawsuit – *e.g.*, voting for "someone other than the Democratic Party's nominee" – was merely a "theoretical possibility." (*Id.*) Taken together, the practical result of the court's reasoning is that UFPEA is not subject to a constitutional challenge. No Presidential Elector that chooses to vote his or her conscience based

15

on the unique circumstances of an election could satisfy that standard. Yet UPFPEA would be enforced again every four years.

This Court has two bases to remedy the district court's error. First, it can reverse that court's decision because, despite the limited record on the issue of mootness, Dr. Abdurrahman has nonetheless demonstrated facts showing that his dispute is capable of repetition. Second, alternatively, this Court can remand the case before deciding the mootness issue because the district court prematurely dismissed Dr. Abdurrahman's declaratory relief claim.

## I.     THE DISTRICT COURT HAD JURISDICTION BECAUSE APPELLENT'S DECLARATORY RELIEF CLAIM IS CAPABLE OF REPETITION, YET EVADING REVIEW.

### A.     The Standard of Review for this Court is *De Novo.*

Dr. Abdurrahman appeals the district court's order dismissing his complaint as moot. (*See* Add011; Appx012.) "Questions of mootness are matters of subject matter jurisdiction that [this Court] review[s] de novo." *Charleston Hous. Auth. v. U.S. Dep't of Agric.*, 419 F.3d 729, 739 (8th Cir. 2005).

16

### B. Appellant's Declaratory Relief Claim Falls Squarely in the Capable of Repetition, Yet Evading Review Exception to Mootness.

The mootness doctrine stems from the U.S. Constitution.[15] "Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). The "case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate." *Id.* And a plaintiff "must continue to have a personal stake in the outcome of the lawsuit." *Id.* at 478. This is the general rule of mootness. *See Murphy v. Hunt*, 455 U.S. 478, 481 (1982) ("In general a case becomes moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.")

An exception to the general rule is when the case is "capable of repetition, yet evading review."[16] *Id.* at 482. This "exception applies where (1) the challenged

---

[15]     While the "constitutional model" is undoubtedly the modern rule, the source and reasoning behind the mootness doctrine remains a subject of scholarly debate. *See, e.g.,* Matthew I. Hall, *The Partially Prudential Doctrine of Mootness*, 77 Geo. Wash. L. Rev. 562, 568-573 (2009) (noting that until 1964 the Supreme Court found mootness to be within a court's prudential discretion and arguing the paradox of a court-created exception to Article III jurisdiction); *see also Honing v. Doe*, 484 U.S. 305, 330-32 (1988) (Rehnquist, C.J. concurring) (acknowledging the same constitutional model paradox through an exception to Article III jurisdiction).

[16]     This language originates from the Supreme Court's decision in *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515 (1911).

17

action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again."[17] *Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007). The second prong, which is the heart of this appeal, requires a "reasonable expectation" *or* a "demonstrated probability" that the "same controversy will recur involving the same complaining party."[18] *Id.* at 463 (quoting *Murphey*, 455 U.S. at 482). A controversy is sufficiently likely to recur when there is a reasonable expectation that the claimant "will again be subjected to the alleged illegality," or "will [again] be subject to the threat of prosecution" under the challenged law. *Id.*

What a plaintiff must show to meet the "reasonable expectation" or "demonstrated probability" standard is unclear. *See Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988) (reviewing the varying language used by the Supreme Court when analyzing mootness). But the Supreme Court has noted that these tests should not swallow the rule that the dispute must be *capable* of repetition, yet evading review.

---

[17]    Dr. Abdurrahman agrees with the district court that he meets the first prong of the capable of repetition, yet evading review exception – whether duration is too short to be fully litigated. (*See* Add003; Appx004.) Thus, Dr. Abdurrahman only addressed the second prong – whether his case is capable of repetition.

[18]    The Supreme Court has specifically noted that these standards are "in the disjunctive." *Honig*, 484 U.S. at 319 n.6. Thus, a claimant must show either a "reasonable expectation" or a "demonstrated probability." *See id.*

18

*See id.* And to be *capable* of repetition, the "recurrence of the dispute" does not even have to be "more probable than not."[19] *Id.*

## 1. The capable of repetition standard is low in cases challenging election laws.

This Court specifically recognizes that "[e]lection issues are among those most frequently saved from mootness by [the capable of repetition, yet evading review] exception."[20] *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 796 (8th Cir. 2016). A review of Supreme Court precedent confirms this Court's analysis. *See, e.g., Davis v. Federal Election Com'n*, 554 U.S. 724, 735-36 (2008) (holding that a challenge to election law is saved from mootness after the election because it was capable of repetition, yet evading review); *Wisconsin Right To Life*, 551 U.S. at 462-64 (same); *Norman v. Reed*, 502 U.S. 279, 287-88 (1992) (same);

---

[19]   This Court has recently quoted and used this articulation of the capable of repetition standard in an election case. *See Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 795 (8th Cir. 2016). Other circuit courts also routinely quote and use this same language. *See, e.g., Stop Reckless Economic Instability Caused by Democrats v. Federal Election Com'n*, 814 F.3d 221, 232 (4th Cir. 2016); *Libertarian Party of Ohio v. Husted*, 831 F.3d 382, 394 (6th Cir. 2016); *Barilla v. Ervin*, 886 F.2d 1514, 1520 (9th Cir. 1989); *Parker v. Winter*, 645 F. App'x 632, 635 (10th Cir. 2016).

[20]   This Court has used this language at least three times prior to *Klahr* when deciding that an election case is not moot. *See Nat'l Right to Life Political Action Comm. v. Connor*, 323 F.3d 684, 692 (8th Cir. 2003); *Van Bergen v. State of Minn.*, 59 F.3d 1541, 1547 (8th Cir. 1995); *Arkansas AFL-CIO*, 11 F.3d 1430, 1436 (8th Cir. 1993).

Appellate Case: 16-4551     Page: 27     Date Filed: 03/09/2017 Entry ID: 4510728

*Anderson v. Celebrezze,* 460 U.S. 780, 786–87 (1983) (same); *Mandel v. Bradley*,

432 U.S. 173, 175 n.1 (1977) (same); *Storer v. Brown,* 415 U.S. 724, 737 n.8 (1974)

(same); *Rosario v. Rockefeller*, 410 U.S. 752, 756 n.5 (1973) (same); *Dunn v.*

*Blumstein*, 405 U.S. 330, 333 n.2 (1972) (same); *Moore v. Ogilvie,* 394 U.S. 814,

816 (1969) (same)).

   Other circuit courts also routinely find that challenges to election laws do not

become moot after the election passes. *See, e.g., Libertarian Party of New*

*Hampshire v. Gardner*, 843 F.3d 20, 24 (1st Cir. 2016); *Nat'l Org. for Marriage,*

*Inc. v. Walsh*, 714 F.3d 682, 692 (2d Cir. 2013); *Merle v. United States,* 351 F.3d

92, 95 (3d Cir. 2003); *Stop Reckless Econ. Instability Caused by Democrats v. Fed.*

*Election Comm'n*, 814 F.3d 221, 233 (4th Cir. 2016); *Catholic Leadership Coalition*

*of Texas v. Reisman*, 764 F.3d 409, 422 (5th Cir. 2014); *Libertarian Party of Ohio*

*v. Husted*, 831 F.3d 382, 393-94 (6th Cir. 2016); *Majors v. Abell*, 317 F.3d 719, 723

(7th Cir. 2003); *Schaefer v. Townsend*, 215 F.3d 1031, 1033 (9th Cir. 2000); *Parker*

*v. Winder*, 645 F. App'x 632, 635 (10th Cir. 2016); *Teper v. Miller*, 82 F.3d 989,

992 n.1 (11th Cir. 1996); *Holmes v. F.E.C.*, 823 F.3d 69, 71 n.3 (D.C. Cir. 2016).

   There are several reasons why "[c]hallenges to rules governing elections are

the archetypal cases for application of [the capable of repetition, yet evading review]

exception." *See LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998); *see also*

*Parker*, 645 F. App'x at 635 ("Challenges to election laws are one of the

20

quintessential categories of cases capable of repetition yet evading review[.]") First, election issues are inherently time sensitive. "If election law cases were rendered moot by the occurrence of an election, many constitutionally suspect election laws could never reach appellate review." *Schaefer*, 215 F.3d at 1033. Second, because election issues will inevitably rise again each cycle, it promotes judicial efficiency to address the issue immediately. *See Arcia v. Florida Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014) ("Election cases also frequently present issues that will persist in future elections, and resolving these disputes can simplify future challenges.") Third, unlike most lawsuits, election issues inherently involve a greater public interest. *See Lawrence v. Blackwell*, 430 F.3d 368, 372 (6th Cir. 2005) (noting that an election "controversy almost invariably will recur with respect to some future potential candidate"); *see also Dunn*, 405 U.S. at 332 n.2 (specifically noting that a controversy exists for other voters and is thus not moot). Thus, for these reasons and others, the capable of repetition, yet evading review exception becomes "somewhat relaxed in election cases." *See Lawrence*, 430 F.3d at 372.

This relaxation is most apparent in decisions from the Fifth, Sixth, and Seventh Circuits, which have carved out an exception to the same-party requirement within the capable of repetition standard for election cases. *See Kucinich v. Texas Democratic Party*, 563 F.3d 161, 164-65 (5th Cir. 2009); *Libertarian Party of Michigan v. Johnson*, 714 F.3d 929, 932 (6th Cir. 2013); *Majors*, 317 F.3d at 723

21

(reasoning that courts "do not interpret the [same-party] requirement literally" in election cases).[21] Thus, in these jurisdictions, candidates challenging an election law need not show that *they* will be subject to the law again, only that there is a "likelihood that the issue will recur between the defendant and the other members of the public at large." *See Catholic Leadership Coal. of Texas v. Reisman*, 764 F.3d 409, 423 (5th Cir. 2014). That said, at least two other circuits maintain the same-party requirement in election cases. *See Stop Reckless Economic Instability Caused by Democrats v. Federal Election Com'n*, 814 F.3d 221, 230 (4th Cir. 2016); *Van Wie v. Pataki*, 267 F.3d 109, 114 (2d Cir. 2001).

This Court does not need to take a position on this circuit split because this dispute is capable of repetition by Dr. Abdurrahman *and* all other future Presidential Electors in Minnesota.[22] The takeaway is that the Supreme Court, this Court, and

---

[21] This exception is founded in part on a dissent by Justice Scalia where he accurately noted that the Supreme Court often ignores whether a case is capable of repetition by the same plaintiff in election cases. *See, e.g., Kucinich v. Texas Democratic Party*, 563 F.3d 161, 164-65 (5th Cir. 2009) (citing *Honig*, 484 U.S. at 335-36 (Scalia, J. dissenting) (citing *Rosario v. Rockefeller*, 410 U.S. 752, 756 n.5 (1973); *Dunn v. Blumstein*, 405 U.S. 330, 333 n.2 (1972))).

[22] If this Court were to find that this dispute is *incapable* of repetition by Dr. Abdurrahman, however, we ask this Court to follow the Fifth, Sixth, and Seventh Circuits in holding that the same-party requirement is not required in election cases. As reasoned by those courts, this position finds ample support in Supreme Court precedent. *See, e.g., Storer v. Brown,* 415 U.S. 724, 737 n.8 (1974); *Rosario*, 410 U.S. at 756 n.5; *Dunn*, 405 U.S. at 333 n.2.

22

other circuit courts provide overwhelming authority and guidance showing that the burden to prove repetition in election cases is not high. The Seventh Circuit described this relaxed burden as follows:

> If a suit attacking an abortion statute has dragged on for several years after the plaintiff's pregnancy terminated, the court does not conduct a hearing on whether she may have fertility problems or may have decided that she doesn't want to become pregnant again. *And similarly in an election case the court will not keep interrogating the plaintiff to assess the likely trajectory of his political career*.

*Majors*, 317 F.3d at 723 (emphasis added). The *Majors* court's articulation is implicit in almost all election cases – that courts will accept a plaintiff's statement of intent at face value. If the plaintiff says he will run for office again, he will run again. The only thing that will moot an election case is if the defendant offers evidence that a plaintiff *cannot* repeat the steps that brought the dispute. Indeed, in most of the rare election cases found to be moot, this is exactly what happened – a subsequent event made repetition *impossible*. This typically happens when the law changes after the lawsuit, which undoubtedly prevents a repeat of the same challenge. *See, e.g., Hall v. Beals*, 396 U.S. 45, 48 (1969) ("And under the statute as currently written, the appellants could have voted in the 1968 presidential election."); *see also Barilla v. Ervin* 886 F.2d 1514, 1516 (9th Cir. 1989) (holding that, although the capable of repetition test is "not a very demanding one," a subsequent change in the law made repetition impossible).

23

The *Majors* court also raised another important point. Should a court be weighing evidence to determine the likelihood of a future political event? For example, in our case, is it appropriate for a court to analyze the political consequences of Dr. Abdurrahman's vote for Bernie Sanders to determine whether, *three years from now*, he can again win the DFL Presidential Elector nomination, and then whether a Democrat or Republican will win Minnesota? The weight of authority suggests no. Instead, these cases instruct this Court to take a prudent approach of accepting credible political intentions as probable short of evidence proving that they are impossible – *i.e.*, determine whether the case is *capable* of repetition.[23] *See Honig*, 484 U.S. at 318 n.6.

Of course, Dr. Abdurrahman's Electoral College election case is admittedly unique. Most election laws apply to candidates for elections, and thus plaintiffs must merely *run* for office again to accomplish repetition.[24] *See, e.g., Van Bergen*, 59 F.3d

---

[23]    To be clear, Dr. Abdurrahman is not arguing that a court should accept any statement of future political ambition to defeat mootness. One can craft a hypothetical that *is* merely a theoretical possibility. *See Van Bergen*, 59 F.3d at 1547. But as courts routinely find, a statement is much more than a theoretical possibility, and thus credible, when it refers to a political act that an individual has already performed or accomplished. Dr. Abdurrahman meets this standard by virtue of already being appointed a Presidential Elector in 2016.

[24]    The other common themes are challenges to election laws by political organizations or voters. *See, e.g., Klahr*, 830 F.3d at 795-96 (political organization); *Rosario*, 410 U.S. at 756 n.5 (voter).

24

at 1546. But for Dr. Abdurrahman to be subject to UFPEA again, he must be (1) elected as a Presidential Elector nominee within the DFL, and then (2) a Democrat must win Minnesota.[25] While this complexity may appear more daunting, this case remains an election issue with a corresponding low burden of persuasion.

The following case exemplifies this point. In *Stewart v. Taylor*, Stewart won the Republican and Libertarian primary elections, but a state law made him choose a nomination. 104 F.3d 965, 967 (7th Cir. 1997). When he refused to choose one party over the other, the state removed his name as the Republican candidate on the ballot. *Id.* Stewart's ensuing lawsuit triggered the typical mootness defense. *Id.* at 969. But also in typical fashion, through the following reasoning, the Seventh Circuit found the election case capable of repetition, yet evading review:

> August 1st to November 5th is a short duration to fully litigate such a case, and as the victor of the Republican primary, *Stewart could be politically popular enough to be subject to this statute again*. For these reasons, the same parties could generate a similar, future controversy.

*Id.* at 969-70 (emphasis added). The takeaway from *Stewart* is that the court was willing to assume that Stewart would be *elected* again, not merely that he will just run again. And the basis for its assumption is that (1) he won before; and (2) he *could*

_____

[25] There are of course other less likely ways Dr. Abdurrahman could be subject to UFPEA again in 2020 or beyond. But any theoretical alternative we offer only highlights the greater probability that Dr. Abdurrahman will be appointed the same way he was appointed in 2016 – in CD5 of the DFL with a Democrat winning Minnesota. This further confirms he has demonstrated the necessary probability.

25

be politically popular enough again. *See id.* Dr. Abdurrahman easily meets this low burden.

Stewart also provides guidance for this Court by considering what the Seventh Circuit did *not* consider important. Like the district court in our case, the Seventh Circuit did not conclude, for example, that it was "especially unlikely," (*see* Add004; Appx005,) that Stewart would not be reelected as a Republican because he refused to choose that party over the Libertarian party. But that is certainly a possible outcome with party politics. The court also did not reason that the same sequence of events – *i.e.*, winning *both* the Republican and Libertarian nominations again in four years – was merely a "theoretical possibility," (*see id.,*) even though accomplishing that feat again may be unlikely. The reason the court did not engage in this analysis is because courts do not engage in political guesswork in election cases. Demonstrating a probability, even if it is not more probable than not, will suffice. *Honig*, 484 U.S. at 318 n.6.

A second case involving the Electoral College also provides some guidance and authority. In *Moore*, the appellants sought to challenge a law that prevented their eventual appointment as Presidential Electors in Illinois. 394 U.S. at 815. In response, the State of Illinois argued that their case is moot because the presidential election had already passed. *Id.* at 816. The Supreme Court disagreed, holding that, because the challenged law "allowed to be placed on the nomination of candidates

26

for statewide offices remains and controls future elections," the case is "capable of repetition, yet evading review." *Id.*

The takeaway from *Moore* comes from what the Court did not find important, but what the dissent did. The majority did not review the probability of appellants becoming candidates for Presidential Elector again, which undoubtedly involved several steps under Illinois law. *See id.* But the dissent demanded something more:

> In the absence of any assertion that the appellants intend to participate as candidates in any future Illinois election, the Court's reference to cases involving continuing controversies between the parties is wide of the mark.

*Id.* at 819 (Stewart, J. dissenting). The dissent thus wanted the prospective Presidential Electors to at least *assert* that they will be candidates for Presidential Electors again in four years. But in this election law context – indeed Electoral College context – the majority would not even go that far. It was enough that appellants, and/or other prospective Electors, *could* be in this situation again.

The most recent Supreme Court precedent in election cases sheds light on this distinction in *Moore*. In *Davis*, the Court found an election case not moot after noting that the appellant "subsequently made a public statement expressing his intent to [run for office again]." 554 U.S. at 736. In *Wisconsin Right to Life*, the Court similarly found an election case not moot after finding that the appellant "claimed" it intended to engage in the same conduct the next election cycle. 551 U.S. at 463. It is unclear in these cases whether the Court *required* these assertions to defeat

27

mootness, or merely recognized them. But even if they were required, the Supreme Court has only raised the bar as high as the dissent in *Moore* – the need for an *assertion* of future conduct. But that is not a high bar at all, and one easily met in our case if Dr. Abdurrahman is allowed to assert his intent.[26]

In summary, challenges to election laws remain the "most frequently saved from mootness," *see Klahr*, 830 F.3d at 796, and with good reason. Election issues are inherently time sensitive, of public interest, and often involve a court engaging in the difficult task of reviewing political considerations, such as a candidate's future ambitions and the likelihood that they will come to fruition. Consistent with prevailing law, this Court should thus hold that Dr. Abdurrahman's credible statement that he intends to become a Presidential Elector again defeats mootness, even though it is impossible to prove with "mathematical certainty" that he will be an Elector again. *See Honig*, 484 U.S. at 318 n.6.

---

[26]     The question of whether plaintiffs must assert their intention to repeat the conduct should not be confused with whether plaintiffs must specifically allege their claim is capable of repetition, yet evading review in a complaint. As Dr. Abdurrahman recently argued in his Reply on his Motion to Supplement the Record, consistent with Fed. R. Civ. P. 8(a), that specific allegation is not required. *See Merle v. United States,* 351 F.3d 92, 95 (3d Cir. 2003); *N. Carolina Right To Life Comm. Fund For Indep. Political Expenditures v. Leake*, 524 F.3d 427, 435–36 (4th Cir. 2008); *Schaefer*, 215 F.3d at 1033.

28

## 2. Appellant has demonstrated a probability that his declaratory relief claim is capable of repetition.

The district court constructed a much higher standard for defeating mootness than anything found in an election case from the Supreme Court, this Court, or another circuit court. The district court reasoned:

> [F]or Abdurrahman to meet the [capable of repetition, yet evading review] exception's second requirement he must again (1) be nominated as an elector by the DFL; (2) during an election when the Democratic Party nominee wins the Minnesota popular vote; and (3) ignore his pledge to vote for someone other than the Democratic Party's nominee.

(Add004; Appx005.) The court then concluded that it was "especially unlikely that Abdurrahman would meet the first prerequisite" because he voted for Bernie Sanders against his pledge, and it was only "theoretically possible [that he] could complete all three prerequisites." (*Id.*)

Dr. Abdurrahman will address these so-called prerequisites in turn. First, while opinions can differ on the future voting proclivities of DFL delegates within CD5, the standard remains whether Dr. Abdurrahman can demonstrate a probability that he will be reelected as a Presidential Elector in 2020 or beyond. And he has made that demonstration. Dr. Abdurrahman has declared he intends to run again in CD5, has proven he can win, has shown his decision to vote for Bernie Sanders in 2016 was well received, which will likely improve his chances of winning election. Thus, with this first prerequisite, Dr. Abdurrahman has demonstrated a probability

29

that his election as a Presidential Elector is capable of repetition. *See Wisconsin Right to Life*, 551 U.S. at 463. And above and beyond the necessary standard, the likelihood of repetition *is* more probable than not. *See Klahr*, 830 F.3d at 795 (citing *Honig*, 484 U.S. at 318 n.6).

Second, the people of Minnesota will again most likely vote for the Democratic Party nominee for President in 2020 or beyond. With 2016 in the books, this has now happened in *eleven* straight presidential elections, the longest active streak for any state voting for the Democratic Party nominee. While anything is *possible*, with this second prerequisite, Dr. Abdurrahman has demonstrated a probability that his appointment as a Presidential Elector, after his election in CD5, is capable of repetition. *See Wisconsin Right to Life*, 551 U.S. at 463. And considering the historical data, he has again gone above and beyond the necessary standard because the likelihood of repetition *is* more probable than not. *See Klahr*, 830 F.3d at 795 (citing *Honig*, 484 U.S. at 318 n.6).

Finally, the so-called third "prerequisite," that Dr. Abdurrahman must "ignore his pledge" again, is not a prerequisite at all. Dr. Abdurrahman "will again be subjected to the alleged illegality," and "will [again] be subject to the threat of prosecution,"[27] upon his *appointment* as a Presidential Elector. *See Wisconsin Right*

---

[27]     While the term "prosecution" is typically used in the criminal context, it also applies to a broader scope of action. *See Prosecution*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The commencement and carrying out of any action or scheme <the

30

*to Life*, 551 U.S. at 463. One effect of this litigation is that Dr. Abdurrahman and all future Presidential Electors know that Appellees will carry out – *i.e.*, prosecute – the unilateral-vacation element of UFPEA. In turn, the moment Dr. Abdurrahman is appointed in 2020 or beyond, because he will be unable to vote for President and Vice-President of the United States as he chooses – and only as the state chooses – he will again be subject to the unconstitutional constraints of that law.[28]

The district court, in fact, even acknowledged that violating the pledge again is not a prerequisite. When dismissing the injunctive relief claim on laches, the district court reasoned that Dr. Abdurrahman "should have brought this lawsuit … before Secretary Simon transmitted the Abdurrahman-less ballots to the President of the Senate." (Add005; Appx006.) If this is true, which Dr. Abdurrahman does not

---

prosecution of a long, bloody war>"). Thus, the second standard in *Wisconsin Right to Life* also logically applies in our case because, once appointed, Dr. Abdurrahman will immediately be subject to the threat that Appellees will carry out UFPEA again. *See* 551 U.S. at 463.

[28]   It is important to recognize that so-called faithless electors are not as unlikely as the district court suggests. Indeed, Dr. Abdurrahman is the second one in the past four elections in Minnesota. *See* BAKST, *supra* note 13. Additionally, in 2016, *ten* Electors across the United States attempted to vote for someone other than their pledged candidate, which is a record number. *See* Kiersten Schmidt & Wilson Andrews, *A Historic Number of Electors Defected, and Most Were Supposed to Vote for Clinton*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2016/12/19/us/elections/electoral-college-results.html?_r=0 (last visited February 28, 2017). Perhaps this is a trend.

31

now challenge,[29] then, according to the district court, Dr. Abdurrahman does not need to actually vote for someone other than his pledged candidate for his case to be capable of repetition.

It is possible the district court failed to recognize that Dr. Abdurrahman's declaratory relief claim included a facial challenge. Thus, perhaps the court assumed that it was only as applied, and thus UFPEA would only be unconstitutional if the exact same sequence of events were repeated. But even if Dr. Abdurrahman only made an as applied challenge, which he did not, he still would not need to repeat every step to defeat mootness. As the Supreme Court reasoned:

> Requiring repetition of every legally relevant characteristic of an as-applied challenge—down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the FEC.

---

[29] Dr. Abdurrahman does not challenge the district court's decision on laches because it only applied to his injunctive relief claim. This is true despite some confusing language from the court. (*See* Add011; Appx012 ("Abdurrahman's claim is moot and barred by laches.").) First, the court explained that the laches defense only applied to the injunctive relief claim. (*See* Add004-06; Appx005-07.) Second, the court stated that the complaint is dismissed as "moot." (Add011; Appx012.) Finally, this reasoning is consistent with the doctrine of laches cited by the district court. (*See* Add004; Appx005 (citing *Citizens & Landowners Against the Miles City/New Underwood Powerline v. Sec'y, U.S. Dep't of Energy*, 683 F.2d 1171, 1175 (8th Cir. 1982).) Considering the effective deadline for relief is now in 2020 or 2021, Appellees cannot be "prejudiced" by Dr. Abdurrahman bringing his declaratory relief claim on December 19, 2016.

32

*Wisconsin Right To Life*, 551 U.S. at 463 (citing *Storer*, 415 U.S. at 737). The specificity demanded by the district court below is similarly beyond what is necessary, even *if* Dr. Abdurrahman were only challenging UFPEA as applied. In summary, the district court simply did not apply the correct standard for defeating mootness in an election case. The court demanded that Dr. Abdurrahman definitively prove the results of elections more than three years away when case authority only requires a showing what is reasonably *possible*. *See Klahr*, 830 F.3d at 795 (citing *Honig*, 484 U.S. at 318 n.6).

One final case from this Court demonstrates this Court's standard for proving capable of repetition. In *Connor*, a political organization made certain election expenditures after a candidate was involved in a plane crash. *Connor*, 323 F.3d at 687. The organization then filed a lawsuit seeking a declaratory judgment that the election law affecting these expenditures was unconstitutional. *Id.* at 689. As usual, the state argued the claims were moot because the election had passed. *Id.* This district court agreed, reasoning that the "uniqueness of the circumstances surrounding the 2000 election," along with "any similar dispute between the parties is highly unlikely to recur." *Id.* at 691. And the district court specifically tied its conclusion to the "unlikelihood" of another "untimely death." *Id.*

This Court was "reluctant to draw such a narrow scope of probability." *Id.* at 692. It first noted that a plane crash killing a candidate *had* repeated itself – the death

33

of Paul Wellstone just six months after the district court's decision. *Id.* So broad statements of unlikelihood are not reliable. This Court further noted that any death, or more broadly any yet-unknown event, could put the plaintiff in the same position next election. *See id.* Thus, "viewed together," the possibility of any of these scenarios "make it reasonably likely" that the case is capable of repetition. *Id.*

*Connor* is important because the district court's reasoning in that case, which this Court already rejected, is strikingly similar to the instant case. That district court sought to raise the bar of persuasion by looking to the "uniqueness" of the past events, rather than recognizing that any number of plausible events could lead to the same constitutional challenge. In our case, the district court reasoned that each of Dr. Abdurrahman's steps in 2016 must be replicated. But that is a very narrow scope of probability. Several things could happen that will leave him subject to UFPEA. And the only requirement is that he is appointed as an Elector in Minnesota while UFPEA remains on the books, whether that happens in 2020, 2024, or anytime thereafter. Considering Dr. Abdurrahman's motivations, that event is reasonably likely to occur, and particularly when its occurrence does not even need to be "more probable than not." *See Klahr*, 830 F.3d at 795 (citing *Honig*, 484 U.S. at 318 n.6).

### 3. The district court's reasoning would make UFPEA unreviewable by an appellate court.

Dr. Abdurrahman will also briefly address the practical result of the district court's decision. Every four years, "after the first Monday after the second

34

Wednesday in December," the duly-appointed Presidential Electors of Minnesota will meet to cast their ballots for President and Vice-President of the United States. 3 U.S.C. § 7. Then, approximately three weeks later, on January 6th, a joint session of Congress will count those ballots. *Id.* § 15. While these time constraints remain constant, thus ensuring factual mootness every cycle, an Elector's motivation for voting his or her conscience rather than the party nominee will *never* be the same.

The district court's reasoning would essentially make UFPEA unreviewable by an appellate court. No duly-appointed Presidential Elector in Minnesota could possibly meet the court's burden of proving that, four years later, he or she will again vote for someone other than the pledged candidate. Indeed, nobody even knows who the candidates *are*. In turn, if allowed by this Court, the state's appeal to the unknown would moot every case brought by a Presidential Elector, thus making UFPEA impregnable to any constitutional challenge.

The Supreme Court has specifically noted that it avoids rigid mootness rules to prevent the absence of appellate review. *See Roe v. Wade*, 410 U.S. 113, 125 (1973); *see also Hall v. Beals*, 396 U.S. 45, 51 (1969) (Marshall, J. dissent) ("Indeed, one of the unfortunate consequences of a rigid view of mootness in cases such as this is that the state and lower federal courts may well be left as the courts of last resort[.]") Instead, unlike the doctrine of standing, there is a "flexible character of the Art. III mootness." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 400–01

35

(1980); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 19–92 (2000) (explaining why mootness is not subject to the same rigid judiciability standards as standing). In our case, to preserve appellate review of state law that directly implicates the U.S. Constitution – and, for that matter, the entire Electoral College system – this Court should also find Article III jurisdiction.

To be clear, this Court does not need to bend the mootness doctrine to find jurisdiction on these facts. As shown, overwhelming authority from the Supreme Court and this Court, along with guidance from other circuit courts, supports a holding that this election case is capable of repetition, yet evading review. Ensuring that a state election law is capable of being subjected to appellate scrutiny is, by itself, a compelling reason to find jurisdiction in this case. *See Corrigan v. City of Newaygo*, 55 F.3d 1211, 1214 (6th Cir. 1995) ("To hold this case moot would require the absurd result that a court would never be able to rule on the Newaygo ordinance."); *see also Van Bergen*, 59 F.3d at 1547 ("The issue of whether Minnesota's [campaign law] passes constitutional muster will never be fully litigated if, at each election, the case becomes moot before appeals can be completed.") This Court should continue this longstanding practice.

Appellate Case: 16-4551    Page: 44    Date Filed: 03/09/2017 Entry ID: 4510728

## II. THE DISTRICT COURT PREMATURELY DISMISSED APPELLANT'S DECLARATORY RELIEF CLAIM.

Dr. Abdurrahman has sufficiently demonstrated a probability that his declaratory relief claim is capable of repetition, yet evading review. This Court can thus reverse the district court's decision finding a lack of jurisdiction based on mootness. This is also the most efficient way to correct the district court's error because it will allow the litigants to begin arguing the merits. It would also prevent this exact same mootness issue from being argued in this Court again. But if it chooses, this Court can also remand the case before deciding the mootness issue because the district court did not provide Dr. Abdurrahman notice and a reasonable opportunity to be heard before dismissing his complaint for mootness.

### A. The Standard of Review for this Court is *De Novo*.

The district court dismissed Dr. Abdurrahman's declaratory relief claim for lack of subject matter jurisdiction based on a *sua sponte* finding of fact that the claim is not capable of repetition and thus moot. (Add004, Add011; Appx005, Appx012.) This Court reviews a dismissal for lack of subject matter jurisdiction *de novo*. *See Keating v. Nebraska Pub. Power Dist.*, 562 F.3d 923, 927 (8th Cir. 2009).

Appellate Case: 16-4551    Page: 45    Date Filed: 03/09/2017 Entry ID: 4510728

**B.** **The District Court Dismissed Appellant's Declaratory Relief Claim Based on an Unsubstantiated *Sua Sponte* Finding of Fact.**

The entire issue of mootness is premature. As stated above, "[m]ootness is a jurisdictional question [that] derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (internal citations omitted). But these "broad constitutional principles, of course, provide no more than the starting point, since the decision as to whether any particular lawsuit is moot can be made *only after analysis of the precise factual situation of the parties involved*." *Super Tire Eng'g Co. v. McCorkle*, 416 U.S. 115, 128 (1974) (Stewart, J., dissenting) (emphasis added); *see also Lewis*, 494 U.S. at 478-80 (analyzing the mootness question on "the record before us" and on "the face of the record").

Other than the two declarations, which are subject to a pending motion, there is no factual record in this case specifically addressing mootness. Because the district court dismissed Dr. Abdurrahman's declaratory relief claim just four days after he commenced this action, neither party had an opportunity to present evidence on the question of whether his claim was capable of repetition. Thus, the district court's conclusion on the issue is mere conjecture. The court simply had no basis to presume that Dr. Abdurrahman would never be appointed as an Elector in Minnesota again because he voted for Bernie Sanders over Hillary Clinton.

38

If we have learned anything from the 2016 presidential election, it is not to assume anything regarding the American voter. While it is reasonable to believe that a DFL delegate from CD5 will not vote for Dr. Abdurrahman in 2020 because he did not abide by his 2016 pledge – the court's theory – it is equally reasonable to believe, as argued above, that a DFL delegate will reward Dr. Abdurrahman for voting for Bernie Sanders. But without even a statement from a DFL delegate in CD5 on the subject, which the district court did not have, either assumption is merely one's opinion of how Dr. Abdurrahman's actions on December 19th will or should be viewed. Opinions, assumptions, and unfounded speculation should not decide issues of subject matter jurisdiction.

### C. The District Court Deprived Appellant of Notice and a Reasonable Opportunity to be Heard.

As a general matter, a district could can dismiss a complaint *sua sponte* for lack of jurisdiction before a party moves to dismiss. *Literature, Inc. v. Quinn,* 482 F.2d 372, 374 (1st Cir. 1973); *see also California Diversified Promotions v. Musick*, 505 F.2d 278, 280 (9th Cir. 1974). But this "power is not absolute[.]" *Id.* Because of the "fundamental requirement of due process," the "absence of notice" and "failure to hold adversary hearing renders the dismissal void." *Id.* (citing *Anderson National Bank v. Luckett*, 321 U.S. 233, 246 (1944)). In other words, a court cannot dismiss a claim "without at least giving plaintiffs notice of the proposed action and affording them an opportunity to address the issues." *Literature,* 482 F.2d at 374 (1st Cir.

39

1973) (citing *Dodd v. Spokane County*, 393 F.2d 330 (9th Cir. 1968)); *see also Gutensohn v. Kansas City S. Ry. Co.*, 140 F.2d 950, 953-54 (8th Cir. 1944); *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 760 F.2d 1347, 1365 (2d Cir. 1985), *aff'd*, 476 U.S. 409 (1986). Failure to provide a party notice and an opportunity to be heard before dismissing a case is, "by itself, grounds for reversal." *Lewis v. New York*, 547 F.2d 4, 5-6 n.4 (2d Cir. 1976).

There are important reasons for requiring notice and an opportunity to be heard before dismissal. For one, it permits parties to present complete arguments for and against dismissal, which assists a court in making the correct decision. *See Schlesinger Inv. P'ship v. Fluor Corp.*, 671 F.2d 739, 742 (2d Cir. 1982). It also alleviates perceptions that courts, through a *sua sponte* dismissal, have come a "proponent rather than an independent entity." *Perez v. Ortiz*, 849 F.2d 793, 797-98 (2d Cir. 1988). Finally, avoiding premature dismissal is a prudent use of judicial resources. *Id*. Dismissing cases before the parties are afforded complete arguments, and then hearing those arguments on appeal, "often leads to a shuttling of the lawsuit between the district and appellate courts." *Ricketts v. Midwest Nat. Bank*, 874 F.2d 1177, 1183-85 (7th Cir. 1989).

In this case, the district court's *sua sponte* dismissal the declaratory relief claim came as a complete surprise to Dr. Abdurrahman. Indeed, he did not even argue that claim – it was a TRO hearing. He had pleaded both an injunctive relief

40

claim and declaratory relief claim knowing that courts treat them differently for purposes of mootness, and thus he would have an opportunity to argue all issues related to the declaratory relief claim – including mootness if raised – after the January 6, 2017 deadline passed. *See, e.g., Thournir v. Buchanan*, 710 F.2d 1461, 1464-65 (10th Cir. 1983) (dismissing an injunctive relief claim as moot but refusing to dismiss the complaint). But instead, four days later, the court dismissed the declaratory relief claim after Dr. Abdurrahman only had an opportunity to argue his injunctive relief claim.

The TRO hearing did not provide Dr. Abdurrahman a reasonable opportunity to distinguish his injunctive relief claim from his declaratory relief claim. In those three short days, the parties briefed and argued the merits of *that* motion, not the complaint itself. And the nature of those hurried proceedings means that the district court did not provide Dr. Abdurrahman any notice that complete dismissal was possible, before he had an opportunity to address the mootness issue.[30] This is, by itself, a reversible error. *See Lewis*, 547 F.2d at 5-6 n.4; *see also Dodd*, 393 F.2d at 334 (noting that a party should at least be afforded an opportunity to submit a written argument in opposition to dismissal).

---

[30] This brief is evidence of the district court's reversible error. In the proceedings below, Dr. Abdurrahman did not have an opportunity to present a single election case supporting the argument he now makes against mootness. But this Court is presented with dozens.

41

The district court's error becomes more pronounced considering it dismissed Dr. Abdurrahman's complaint for lack of jurisdiction on the pleadings.[31] "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). Put another away, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Id.* (quoting *Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994)). But for plaintiffs to receive the benefit of all favorable inferences when a court goes beyond the pleadings, they must have notice and an opportunity to rebut those findings and/or present their own to establish jurisdiction. *See Bryson v. Brand Insulations, Inc.*, 621 F.2d 556, 559 (3d Cir. 1980) ("[B]ecause judgment on the pleadings results in an early assessment of the merits of plaintiff's action, the plaintiff must be given the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn.")

---

[31]     Dr. Abdurrahman does not dispute that the district court has authority "to consider matters outside the pleadings on a motion challenging subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Drevlow v. Lutheran Church, Missouri Synod*, 991 F.2d 468, 470 (8th Cir. 1993). But he does challenge the appropriateness of this dismissal without notice and an opportunity to properly challenge the court's *sua sponte* findings.

42

It is possible that the district court dismissed Dr. Abdurrahman's complaint *sua sponte* in just four days to expedite this litigation. If so, its effort unfortunately had the opposite effect. The Sixth Circuit explained this problem:

> Finally, the *sua sponte* dismissal, most likely intended by the district court as a device for judicial economy, actually results in the waste of judicial resources. This action was filed and dismissed in 1980 and now, over two years later, we are faced with an appeal which has no record other than the plaintiff's complaint and the district court's brief order dismissing the case. The lack of any factual record not only hampers the defendant in making his most effective arguments but also prevents us from making any decision except one based upon broad legal grounds."

*Tingler v. Marshall*, 716 F.2d 1109, 1111 (6th Cir. 1983).[32] The district court's expedited dismissal puts this Court in a similar situation. As it stands, Court simply does not have any record to evaluate in its *de novo* review to determine whether the district court was correct. Any decision in that context is only on the broadest of legal grounds and not the pertinent facts in the case.

Dr. Abdurrahman sought to avoid any further waste of judicial resources by moving to supplement the record. With these declarations, this Court will have the facts necessary to reverse the district court on the mootness issue, and thus prevent future "shuttling" of this mootness dispute "between the district and appellate

---

[32] The *Tingler* court made its holding on narrower grounds than in our case – dismissal before a complaint is served. *See Tingler v. Marshall*, 716 F.2d 1109, 1111 (6th Cir. 1983). Thus, to be clear, Dr. Abdurrahman merely uses this case to explain the problem with attempting to expedite litigation through summary dismissals.

43

courts."[33] *See Ricketts*, 874 F.2d at 1183–85. But the fact that Dr. Abdurrahman had to make this motion – to finally introduce *some* evidence on the issue of mootness – confirms that the district court's dismissal was premature could be immediately remanded. As stated above, however, Dr. Abdurrahman submits that deciding the mootness issue on this appeal remains the most efficient use of judicial resources.

## CONCLUSION

Dr. Abdurrahman has demonstrated a probability that he will be subject to UFPEA again in 2020 or beyond. All that must happen is that he is elected a Presidential Elector for the DFL in CD5 – something he has proven he can accomplish – and the citizens of Minnesota must vote for a Democrat again – something they have done in every presidential election since 1976. This probability meets the low standard for demonstrating capable of repetition in election law cases. In turn, this Court should reverse the district court's dismissal of Dr. Abdurrahman's declaratory claim as moot and remand the case to be decided on the merits.

Alternatively, because the district court dismissed Dr. Abdurrahman's declaratory relief claim in just four days, without notice of possible dismissal and a reasonable opportunity for Dr. Abdurrahman to dispute the court's unsubstantiated

---

[33] Even if this Court does not grant Dr. Abdurrahman's motion to supplement the record, it can still now decide the mootness issue because, even on broad legal grounds, with Dr. Abdurrahman receiving the benefit of all favorable inferences, there is a reasonable expectation that his declaratory relief claim is capable of repetition. *See Klahr*, 830 F.3d at 795.

44

*sua sponte* findings of fact, this Court can simply remand the case to develop a record on the issue of mootness. But this approach is less efficient because, with support from overwhelming case authority from the Supreme Court and this Court, Dr. Abdurrahman will nonetheless eventually demonstrate that he meets the capable of repetition, yet evading exception to defeat mootness.

ECKLAND & BLANDO LLP

Dated: March 9, 2017 /S/ DANIEL J. CRAGG
Daniel J. Cragg
Vince C. Reuter
Jared M. Reams
10 South 5th Street, Suite 800
Minneapolis, MN 55402
(612) 236-0160

*Counsel for Appellant*

45

## CERTIFICATE OF COMPLIANCE

1.    The Brief for Appellant complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 11,306 words, excluding the parts of the brief excluded by Federal Rule of Appellate Procedure 32(f).

2.    The Brief for Appellant complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it is prepared in proportional spaced 14-point font typeface using plain, roman style font.

3.    The Brief for Appellant complies with this Court's Rule 28A(h) because it has been scanned for viruses and it is virus-free.

ECKLAND & BLANDO LLP

Dated: March 9, 2017

/s/ DANIEL J. CRAGG
Daniel J. Cragg
Vince C. Reuter
Jared M. Reams
10 South 5th Street, Suite 800
Minneapolis, MN 55402
(612) 236-0160

*Counsel for Appellant*

46

## CERTIFICATE OF SERVICE

I hereby certify that on March 9, 2017, I served a copy of the foregoing BRIEF FOR

APPELLANT by electronic means on the following principal counsel:

Nathan J. Hartshorn
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
445 Minnesota Street, Suite 1800
St. Paul, MN 55101
(651) 757-1252
nathan.hartshorn@ag.state.mn.us

*Counsel for Appellee*

ECKLAND & BLANDO LLP

Dated: March 9, 2017

/s/ DANIEL J. CRAGG
Daniel J. Cragg
Vince C. Reuter
Jared M. Reams
10 South 5th Street, Suite 800
Minneapolis, MN 55402
(612) 236-0160

*Counsel for Appellant*

47